UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
DIANE COLEMAN,                      )
          Plaintiff                 )
                                    )        CIVIL ACTION
          v.                        )        NO. 09-10875-WGY
                                    )
MICHAEL J. ASTRUE, as he is         )
Commissioner, Social Security       )
Administration,                     )
          Defendant.                )
_____)


MEMORANDUM OF DECISION

YOUNG, D.J.                                    July 29, 2010

## I.    INTRODUCTION

Diane Coleman ("Coleman") brings this action against Michael
J. Astrue, Commissioner of the Social Security Administration
(the "Commissioner").  Coleman seeks to have this Court reverse
or remand the Commissioner's decision denying Coleman's
application for Social Security Disability Insurance Benefits
("SSDIB") and Supplemental Security Income ("SSI").  Pl.'s Mot.
Rev. Decision of Commissioner, ECF No. 10.  The Commissioner
moves for an order affirming his final decision.  Def.'s Mot.
Order Affirming Decision of Commissioner, ECF No. 12.

### A.    Procedural Posture

Coleman applied for SSDIB and SSI on December 18, 2006.
Admin. Tr. ("Adm. R.") at 76, 84.  The Commissioner denied

Coleman's application on June 4, 2007.  Id. at 46.  Coleman then filed a timely request for review by a federal reviewing official.  Id. at 53-55.  On January 22, 2008, the federal reviewing official again denied Coleman's application, finding Coleman not disabled under the Social Security Act (the "Act") on the basis that she did not suffer from sufficiently severe impairments.  Id. at 43.  Subsequently, Coleman filed a request for a hearing.  Id. at 65.  The hearing was held in Boston, Massachusetts on October 16, 2008.  Id. at 16.  The hearing officer issued a decision denying Coleman SSDIB and SSI on December 19, 2008, after finding Coleman, although severely impaired, capable of performing past relevant work.  Id. at 7-15.  The Decision Review Board declined to disturb the hearing officer's decision.  Id. at 1.

Thereafter, Coleman filed her complaint in this Court against the Commissioner on May 26, 2009.  Compl., ECF No. 1.  The Commissioner filed his answer on August 10, 2009.  Answer, ECF No. 4.

**B.   Facts**

At the time of the hearing, Coleman was a forty-eight year old mother of three, living with her husband and two daughters.  Adm. R. at 19-21.  Coleman has a ninth grade education and was last employed as a waitress, but also has previous work experience as a cashier and receptionist.  Id. at 19-20, 33-34.

Despite attempting to work for a short period in March of 2006, Coleman has not been gainfully employed since August 1, 2005, the date of alleged disability onset.  Id. at 20, 84.  The bases of Coleman's alleged disability are bilateral foot bunions and neuroma on the right foot, attention deficit disorder ("ADHD"), and anxiety disorder.[1]  Id. at 10, 112.

### 1.    Physical Impairments

After suffering severe pain in her feet from working long hours as a waitress, Coleman was advised by her doctor at Boston Medical Center, Dr. Hurwitz, on August 7, 2003, that the only cure for her pain was surgery.  Id. at 168.  Almost two years later, on May 26, 2005, Coleman asked to be re-evaluated regarding her feet because she had been unable to work when her bunions acted up.  Id. at 182.  The pain persisted and progressively worsened, especially with walking, and was interfering with Coleman's ability to work by July 14, 2005.  Id. at 175.[2]  On July 20, 2005, X-Rays were taken revealing a "hallux

---

[1] Coleman initially alleged that her disability was also a result of a hysterectomy.  Adm. R. at 112.  The hearing officer did not, however, find the hysterectomy or its effects on Coleman to amount to a severe impairment.  Id. at 10.  Because Coleman does not challenge this finding, this Court does not consider or discuss the evidence relevant to Coleman's hysterectomy.

[2] Dr. Hurwitz's medical record from July 14, 2005 reads: "45 y F here for persistent R foot pain 1st MTP.  Progressively worse.  Also has pain that shoots between her 2nd and 3rd toes.  Radiates up the dorsum of the foot.  Has tried NSAIDs w/o improvement.  Switched shoes and wears sneakers most of the time.  Pain is worse wiht [sic] walking.  Having difficulty staying at

vulgus," or bunion, on Coleman's right foot as well as hammertoe deformities and strong indicators of Morton's type neuroma.  Id. at 171, 434.  Dr. Hurwitz performed surgery on Coleman on August 18, 2005, to correct her right foot.  Id. at 434.  In the few months directly following surgery, Coleman's incision healed well and she suffered only mild pain and extensional limitations.  See id. at 201, 432-33.

For a period of time thereafter, the record does not indicate that Coleman sought treatment for her foot or complained of any foot complications.  For example, on September 25, 2006, Coleman reported to her doctors that she climbed three flights of stairs daily without issue, and was without complaints regarding her foot pain.  See id. at 287.  Further, on December 10, 2006, Coleman was treated in the emergency room on an unrelated medical issue.  Id. at 308.  The report following that treatment indicated that upon inspection of her lower extremity, Coleman had normal range of motion and gait, ambulated normally, and was able to walk on her own power.  See id. at 312-13.

Coleman applied for SSDIB and SSI on December 18, 2006.  Id. at 76, 84.  In conjunction with her application, two consultative physicians submitted reports regarding Coleman's physical impairments.  On April 5, 2007, Dr. Kriston submitted a case

---

work.  Works as a waitress/catering.  No systemic fevers."  Adm. R. at 175.

analysis concluding that Coleman's combination of medical impairments was not severe.  Id. at 693.  Pertinent to Coleman's foot impairment, Dr. Kriston noted that Coleman had not recently sought medical attention for her foot, did not exhibit upper or lower extremity weakness, and her gait was normal.  See id. Similarly, on May 18, 2007, Dr. Kovalcik wrote in her consultative examination report that Coleman did not express physical symptoms of discomfort and was able to walk and stand normally and without difficulty while being observed.  See id. 394.

On January 4, 2008, Dr. Chou, Coleman's present treating physician, reported, "[s]he cannot bend her right great toe.  Has pain across top of foot and great toe after being on feet for a long time.  Pain described as throbbing.  In general she isn't happy with the results of surgery."  Id. at 614.  Similarly, on July 7, 2008, Dr. Chou indicated that Coleman complained of chronic foot pain, "since surgery 3 years ago, cannot walk.  Foot is deformed and she has numbness in toes.  Has not been able to work as waitress/bar tender for 3 years.  Pursuing disability but wants a 2nd opinion."  Id. at 601.

## 2.  Psychological Impairments

Coleman has been diagnosed with and is medicated for ADHD and anxiety disorder.  As early as October 19, 2005, Coleman complained to Dr. Chou that she suffered from a five-year problem

of memory loss.  Id. at 428.  Later, on May 17, 2006, Coleman was tested and met the criteria for ADHD.  Id. at 421.  About a month later, Dr. Chou prescribed Ritalin for Coleman's ADHD.  Id. at 212.  Coleman showed initial improvements in memory after being medicated, however adverse side effects demanded change of her Ritalin dosage and prescription.  See id. at 209, 234, 251, 255, 283-84.  On October 17, 2006, Coleman reported for the first time to Dr. Russell at Behavioral Health Services for an initial evaluation.  Id. at 384.  At that time, Coleman reported that Ritalin did not agree with her or improve her memory.  Id.  Dr. Russell reported, "[Coleman's] presentation is odd: above all she seems to have significant short term memory problems."  Id.  As a result, Dr. Russell prescribed Adderall to Coleman.  Id. at 385.

Despite initially questioning whether Coleman suffered from ADHD at all (as opposed to general memory decline), Dr. Russell continued to work with Coleman to change her prescription so that it performed most effectively while countering adverse side effects.  See id. at 374, 379.  On January 12, 2007, after Coleman had applied for social security benefits and income, Dr. Russell indicated that despite Coleman's reports of continued stress and worries, "she functions much better now that she is taking the Adderall.  She is well groomed, organized and insightful."  Id. at 364.  Although Coleman still was struggling to remember and concentrate, by March 9, 2007, Dr. Russell found

Coleman to be "doing well."  Id. at 354-55.

On May 18, 2007, Dr. Kovalcik performed a consultative examination report of Coleman.  Dr. Kovalcik performed various tests on Coleman to determine her mental status, including a Mini-Mental Status Exam, the Bender-Gestalt Drawing Test, the Trailmaking Test, and the Wechsler Memory test.  Id. at 393. Coleman's performance on the Mini-Mental Status Exam revealed weaknesses in "the domain of mental control."  Id.  On the Bender-Gestalt Drawing Test, Coleman's drawings were "relatively well organized" and "did not indicate a significant number of errors, suggesting a brain-related organicity."  Id.  Dr. Kovalcik concluded that Coleman's performance on the Trailmaking Test indicated mild weaknesses in the area of mental control. Id.  Lastly, the Weschler Memory Test revealed that Coleman was within "average range," scoring in the thirtieth percentile for general memory and the tenth percentile for working memory.  Id. at 393-94.

On May 31, 2007, Dr. McKenna submitted a psychiatric review technique of Coleman.  She determined that Coleman suffered from the non-severe mental impairments of "ADHD vs pain [m]ed-related distractibility" and mild anxiety disorder.  Id. at 584-85, 589. Further, she found that these resulted in only "mild" functional limitations.  Id. at 594.

In Coleman's subsequent visits with Dr. Russell in the

spring of 2007, however, Coleman reported high levels of stress
arising from family issues, housing issues, and being denied
social security.  See id. at 513, 528.  For example, Dr.
Russell's April 24, 2007 notation reads, "[Coleman] [s]tates that
her living situation is getting even more stressful R/T further
legal and housing issues.  She also states that he[r]
forgetfullness [sic] only gets worse.  It is unclear what is
stress/ADD induced V. what is r/t organic memory loss."  Id. at
528.  Furthermore, the July 3, 2007 Behavioral Health Service
notes state, "[a]t this point, pt continues to experience major
depression.  Pt reports experiencing insomnia, low self esteem,
poor concentration and difficulty making decisions. . . .  Pt is
now addressing her issues of experiencing constant stress in
therapy."  Id. at 509.  Similarly, on that same day, Dr. Russell
concluded, partly based on Coleman's pattern of losing her
prescription, "[t]here is no doubt she has significant
attentional issues and is emotionally overwhelmed at this time.
It is very easy to see how she could lose scripts."  See id. at
620.  Due to continuing problems of loss of memory,
distractability, acting impulsively, and ongoing irritability,
Coleman's Adderral dosage was increased.  See id. at 498, 500.
By September 4, 2007, Coleman's attention was reported to have
"improved significantly."  Id. at 484.  Even with her improved
condition, however, Coleman continued to request early refills of

her prescription due to forgetting or misplacing them.  See id. at 479, 624.

Despite various family and financial stressors (including denial of SSDIB and SSI), id. at 669, Coleman was repeatedly described as doing quite well from late 2007 through 2008.  See id. at 624, 629, 641, 676, 683.  For example, as of September 15, 2008, Coleman was reported to be "doing well," but was early again for her medication due to her "inattentive[ness]."  Id. at 624.

## II.  ANALYSIS

### A.  Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is limited to the extent that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  Id.; see Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  The landmark of substantial evidence is reached only when "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

Therefore, this Court must affirm the Commissioner's
decision, "even if the record arguably could justify a different
conclusion, so long as it is supported by substantial evidence,"
Rodriquez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3
(1st Cir. 1987) (per curiam), as it is solely the role of the
Commissioner – and not this Court – to make credibility
determinations, factual inferences, and to resolve evidentiary
conflicts.  Ortiz, 955 F.2d at 769.  This Court may overturn the
Commissioner's denial of benefits, however, where he has
"committed a legal or factual error in evaluating a particular
claim."  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76
F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S.
877, 885 (1989)).

**B.    Social Security Disability Standard**

An individual is considered disabled under the Act if she is
unable "to engage in any substantial gainful activity by reason
of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A).

The Social Security Administration promulgated a five-step
sequential analysis to determine whether a claimant is disabled.
See 20 C.F.R. § 404.1520(a)(4).  The hearing officer, after

considering all record evidence, must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a sufficiently severe impairment; (3) whether the impairment meets or equals a listed impairment;[3] (4) whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience.  Id.

The claimant bears the burden in the first four steps to show that she is disabled within the meaning of the Act.  Sherwin v. Sec'y of Health & Human Servs., 685 F.2d 1, 2 (1st Cir. 1982). Once the claimant has established that she is unable to return to her former employment, the burden shifts to the Commissioner to prove the fifth step, i.e., that the claimant is able to engage in substantial gainful activity existing in significant numbers in the national economy.  Id.

C.   The Hearing Officer's Decision

The hearing officer made the following findings of fact and conclusions of law: (1) Coleman meets the insured status requirements of the Act; (2) Coleman has not engaged in

---

[3] If claimant's proffered impairment meets or exceeds a listed impairment, the claimant is deemed disabled per se and the inquiry ends.  Sanabria v. Astrue, No. 06-11380, 2008 WL 2704819, at *2 (D. Mass. July 9, 2009) (Gertner, J.).

substantial gainful activity since August 1, 2005; (3) Coleman

suffers from the severe impairments of bilateral foot bunions and

neuroma on the right foot, ADHD, and anxiety disorder; (4)

Coleman does not have an impairment, or combination of

impairments, that meets or equals listed impairments; (5) Coleman

has the RFC to perform the full range of medium work limited to

unskilled and semi-skilled jobs where the work is routine and

repetitive; (6) Coleman is capable of performing past relevant

work as a receptionist and cashier; and (7) Coleman is not

disabled under the Act.  Adm. R. at 9-14.[4]

Accordingly, the hearing officer determined Coleman was not

disabled under the Act at the fourth step of the disability

analysis.  The hearing officer specifically found:

> The claimant has the residual functional capacity to
> perform the full range of medium work as defined in 20
> CFR 404.1567(c) and 416.967(c).  She is, however, limited
> to jobs of an unskilled and semi-skilled nature, where
> the work is routine and repetitive, due to her memory and
> concentration difficulties.  She should also avoid work
> environments where she would be required to walk on
> uneven surfaces or at unprotected heights due to her foot

---

[4] Additionally, the hearing officer found:

Although the decision of the Federal Reviewing Official
(FedRO) was not considered to be evidence, I agree with
the conclusion on disability the FedRO made on the Title
II and Title XVI claims.  However, I do not agree with
all the substantive findings the FedRO made on these
claims (20 CFR 405.370).

Adm. R. at 14.

pain; and for this reason, she should also avoid climbing
ladders, ropes or scaffolds.

Id. at 12.  The hearing officer based his determination on a
finding that Coleman's statements regarding her impairments'
severity and impact on her ability to work are not "fully
credible."  Id. at 13.  The hearing officer expressly found that
the level of pain, anxiety, and forgetfulness Coleman complained
of would require her to be physically and emotionally
debilitated, however, he found this inconsistent with the
objective medical evidence and Coleman's reported daily
activities.  See id.  The hearing officer ultimately concluded:

> After careful consideration of the evidence, I find that
> [Coleman's] medically determinable impairments could
> reasonably be expected to cause the alleged symptoms;
> however, [Coleman's] statements concerning the intensity,
> persistence and limiting effects of these symptoms are
> not credible to the extent they are inconsistent with the
> above residual functional capacity assessment.

Id.  In accordance with this assessment and Coleman's description
of her past employment, the hearing officer determined that she
was capable of performing her past work as a receptionist or
cashier, which the hearing officer classified as "ranging from
sedentary to light in exertional demands and from unskilled to
the low end of semi-skilled."  Id. at 14.

### D.  Challenge to the Hearing Officer's Decision

Coleman challenges the hearing officer's conclusion that she

13

is able gainfully to return to her past work as a cashier or receptionist on the basis that the hearing officer impermissibly rendered an opinion as to Coleman's RFC without the aid of expert opinions.  See Pl.'s Mem. Supp. Mot. Reverse ("Pl.'s Mem.") 10.

A hearing officer, as a lay person, generally is not qualified to interpret raw medical data to determine a claimant's RFC.  Manso-Pizarro, 76 F.3d at 17.  Rather, if a claimant has sufficiently put her functional inability at issue, the hearing officer is obliged to measure the claimant's relevant capabilities.  "[T]o make that measurement, an expert's RFC evaluation is ordinarily essential."  Id. (quoting Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991)).  Thus, a hearing officer's determination of a claimant's RFC made without any assessment of RFC by an expert is not supported by substantial evidence and must be remanded to obtain further functional evidence.  See Perez v. Sec'y of Human & Health Servs., 958 F.2d 445, 446 (1st Cir. 1991) (per curiam).  Where the record is devoid of an expert's determination of RFC, however, the hearing officer is not precluded from rendering "common-sense judgments about functional capacity based on medical findings, as long as [he] does not overstep the bounds of a lay person's competence and render a medical judgment." Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st

14

Cir. 1990).

An expert's assessment of Coleman's RFC, either physical or psychological, is completely absent from the record.  Thus, this Court must evaluate whether the evidence clearly suggests that Coleman's impairments are mild and pose to the lay person no significant functional restrictions.  See Manso-Pazarro, 76 F.3d at 17-18.  If that is the conclusion of this Court, the hearing officer's decision must be upheld.  Id. at 18.  Otherwise, this action must be remanded for development of functional evidence as the hearing officer's decision was not supported by substantial evidence.  See id.

Coleman has proffered evidence of her physical and psychological impairments, putting her functional capacity to be gainfully employed at issue.  Despite this, and based upon consideration of Coleman's credibility,[5] the hearing officer determined that Coleman was fully capable of performing her past work "classified as ranging from sedentary to light in exertional demands and from unskilled to the low end of semi-skilled."  Adm.

---

[5] Although the hearing officer had a psychiatric review technique form from Dr. McKenna and a case analysis from Dr. Kriston finding Coleman did not suffer from any severe impairments, he presumably disagreed with those opinions in finding Coleman suffered from multiple severe impairments and only discussed his credibility evaluation of Coleman in his determination of her functional capabilities.  Compare Adm. R. at 584-97, and id. at 693, with id. at 10, 12-13.

R. at 13-14.[6]

### 1.  Physical Limitations and Exertional Capabilities

In order for Coleman to possess the RFC to perform light work, she must be found to have the capacity to lift up to twenty pounds at a time, and ten pounds regularly, as well as be able to walk and stand for substantial periods of time.  See 20 C.F.R. § 404.1567(b).  Likewise, sedentary work involves substantial periods of sitting, but may include walking, standing, as well as limited instances of lifting up to ten pounds of weight.  20 C.F.R. § 404.1567(a).

After having surgery on her right foot on August 18, 2005, to correct her bunion, hammertoe deformities, and Morton's type neuroma, Adm. R. at 434, Coleman continued to experience persistent pain and discomfort in her feet.  To that end, Coleman testified before the hearing officer that she was incapable of being gainfully employed as she was in constant pain, was unable to sit for longer than an hour at a time, was unable to stand still, could not walk further than two blocks, and experienced pain when lifting even a gallon of milk.  Id. at 29-31.  The

---

[6] Although the hearing officer deemed Coleman capable of the full range of medium work, Adm. R. at 12, this Court only reviews whether there is substantial evidence supporting the hearing officer's conclusion that she is capable of performing her past work, which is of a light and sedentary nature.  Cf. 20 C.F.R. § 404.1567(c).

hearing officer properly and indisputably exercised his discretion in evaluating Coleman's credibility and determined her testimony was only partly credible in that her symptoms are real but not as intense, persistent, and extreme as she claims.  <u>Id.</u> at 13.  The hearing officer made this determination on the following objective medical evidence as well as Coleman's own implicit concessions as to her functional ability.

Dr. Kriston, after performing a case analysis on April 5, 2007, came to a similar conclusion and dismissed Coleman's claims that she could only lift five pounds and walk one-hundred feet before resting, finding "no evidence of upper or lower extremity weakness" and Coleman's gait to be normal.  <u>Id.</u> at 693. Additionally, Dr. Kovalcik, in her consultative examination report of May 18, 2007, stated: "During this evaluation, . . . [Coleman] did not present any symptoms of being in physical discomfort while in my office.  She was able to walk into my office.  Her gait was stable.  She was able to sit down and get up from the chair without significant difficulties."  <u>Id.</u> at 394.

Neither the hearing officer nor the record, however, indicate that Coleman is without <u>any</u> pain or impairment in her right foot.  Coleman's doctors at Boston Medical Center repeatedly and recently noted the existence of continued complications with Coleman's foot.  For example, three and a half

months after surgery, although having well-healed incisions,
Coleman was in pain and unable to fully extend her foot.  Id. at
201.  These problems remained and on January 4, 2008, Dr. Chou
noted that Coleman was unable to "bend her right great toe.  Has
pain across top of foot and great toe after being on feet for a
long time."  Id. at 614.  More recently, on July 7, 2008, Dr.
Chou again indicated that Coleman's foot was "deformed," that she
had numbness in her toes, and she claimed to experience some
difficulty walking.  See id. at 601.

Even with such evidence of pain and physical impairment,
however, the record as a whole clearly demonstrates to any lay
person employing common sense judgments that Coleman suffers from
no significant exertional impairments precluding her ability to
perform sedentary work.[7]  The record substantially shows, through
Coleman's own admissions, that she is fully capable of sitting,
occasionally walking and standing, as well as lifting a limited

---

[7] This Court, however, would be hesitant to reach the same
conclusion as to whether Coleman is functionally capable of
performing a full range of light, let alone medium, work.  See 20
C.F.R. § 404.1567(b) (requiring frequent lifting, walking, and
standing).  It would blur the line between common sense and
medical judgment to decipher the lengthy medical record, rampant
with numerous doctor's notations, to determine that Coleman is
capable of frequently lifting ten pounds of weight and walking
and standing a great deal.  Cf. Gordils, 921 F.2d at 329
("Although we think it permissible for the Secretary as a layman
to conclude that a 'weaker back' cannot preclude sedentary work,
we would be troubled by the same conclusion as to the more
physically demanding light work.").

amount of weight.  For example, as early as the fall of 2006,
Coleman informed her doctors that she was capable of walking
three flights of stairs daily without a problem, id. at 287, and
reported to the Commissioner that she currently walks her dog up
to three times a day, prepares meals for her family weekly for up
to two hours, spends much of her day sitting watching television
and crocheting, and goes grocery shopping bi-weekly with her
daughter, id. at 123-25.[8]  Furthermore, Coleman did not seek
consultation or treatment for her foot impairments in any way
that is substantially produced in the record between November 30,
2005 and January 4, 2008 (after having already been denied social
security benefits and income).  See id. at 201, 614.  Thus, this
Court finds ample evidence that Coleman is fully capable of
sitting, walking and standing occasionally, and lifting a
restricted amount of weight periodically.  Accordingly, the
hearing officer properly made a common sense, and not medical,
judgment that Coleman has the RFC to perform her past sedentary
job as a receptionist, which requires her to sit "most of the
time" with only "brief periods" of walking or standing.  See
Dictionary of Occupational Titles ("DOT") 237.367-038 (Rev. 4th

---

[8] In the same function report, Coleman indicates that she
experiences trouble using stairs causing her to walk very slowly,
that her feet throb when she walks long distances, that she is
only capable of lifting five pounds, and can only walk three
blocks.  Adm. R. at 126.

ed. 1991) (defining the strength requirements for an occupation
as a receptionist as sedentary).[9]

### 2. Psychological Limitations and Nonexertional Capabilities

This Court, however, must also consider whether Coleman's
psychological impairments inhibit her ability to be gainfully
employed as a receptionist.  The hearing officer concluded that
according to Coleman's evidence as well as the Dictionary of
Occupational Titles, Coleman's past work ranged from unskilled to
"the low end of" semi-skilled.  Adm. R. at 14.  Although it is
disputed whether the position of receptionist is in fact
unskilled,[10] Coleman has proffered evidence to raise significant
question as to her mental capability to perform the minimum level
of unskilled work.

The hearing officer determined that to be gainfully employed
in even unskilled employment, Coleman needed to be able: "to

---

[9] The same is not necessarily true of Coleman's past
experience as a cashier, as the work of cashiers is deemed light
work.  See DOT 211.462-014 (classifying the work of a "cashier-
checker" as light).

[10] The Commissioner's memorandum, in fact, declares that the
job of a receptionist is semi-skilled.  Def.'s Mem. Supp. Mot.
Aff. Decision ("Def.'s Mem") 18.  The Dictionary of Occupational
Titles determines that the "specific vocational preparation" for
work as a receptionist is "over 3 months up to and including 6
months."  DOT 237.367-038.  Thus, according to the Commissioner's
admission that semi-skilled work corresponds to a specific
vocational preparation of between three and four months, the job
of a receptionist is semi-skilled.  See Def.'s Mem. 18.

understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Adm. R. at 14 (describing the "basic mental demands of competitive, remunerative, unskilled work"). The hearing officer, despite finding that Coleman suffered "moderate difficulties" with concentration, persistence, and pace, abruptly concluded that "[t]here is no evidence in the record which establishes that the claimant has any significant limitations." Id. at 11, 14. The hearing officer was not properly qualified to so conclude without the aid of an expert.

After being diagnosed with ADHD and anxiety disorder, Coleman's condition improved with medicinal treatment. See, e.g., id. at 664, 676. Coleman's improvement, however, has not been steady, without setbacks, or necessarily complete. Rather, Coleman has experienced many adverse side effects causing her to either change medication dosages or her prescription completely. See id. at 209, 234, 255, 283-84. Even when a medication has been reported to initially improve Coleman's condition, Coleman has experienced setbacks resulting in the medication losing its effectiveness. Compare id. at 209 (stating concentration improved on Ritalin), with id. at 384 (stating Ritalin did not improve memory). Furthermore, despite the effectiveness of her

most current prescription in continuing to improve her ADHD
symptoms, Coleman has remained inattentive and forgetful in some
respects.  See, e.g., id. at 624 (showing that despite "doing
well" for months, Coleman was still unable to refill her medicine
on time).

Moreover, there is no medical opinion on record that
connects Coleman's mental condition – improved or not – to her
functional ability to perform any sort of employment.[11]  The
closest the record comes to doing so is with Dr. McKenna's
psychiatric review technique, finding Coleman suffered from only
mild limitations in activities of daily living, maintaining
social function, concentration and persistence, and pace.  Id. at
594.  This, however, is certainly not the equivalent of a RFC
assessment and is not to be relied upon in the fourth step of the
disability analysis.  See Title II and XVI: Assessing Residual
Functional Capacity in Initial Claims, Soc. Sec. Ruling 96-8p, 61
Fed. Reg. 34474, 34477 (July 2, 1996) ("Soc. Sec. Ruling 96-8p")
("The adjudicator must remember that the limitations identified

---

[11] For example, there is absolutely no medical opinion on
record stating that Coleman's psychological functional ability to
work would be aided by "routine and repetitive work," as the
hearing officer so concluded.  See Adm. R. at 12.  Rather, this
conclusion is facially contrary to the hearing officer's
declaration that Coleman suffered no significant limitations on
the fundamental requirements for unskilled work, including the
ability "to deal with changes in routine work settings."  See id.
at 14.

in [a psychiatric review technique] are not an RFC assessment but
are used to rate the severity of mental impairment(s) at steps 2
and 3 of the sequential evaluation process.  The mental RFC
assessment used at steps 4 and 5 of the sequential evaluation
process requires a more detailed assessment."); see also
Sanabria, 2008 WL 2704819, at *6.  Rather, a psychiatric review
technique is used to determine, at step two, whether impairments
are severe and consists of only brief, undetailed, and
unexplained conclusions.  See Soc. Sec. Ruling 96-8p, 61 Fed.
Reg. at 34477; Adm. R. at 594 (consisting of conclusory checked
boxes, without any explanation or support of the conclusions
reached).

In contrast, the record does retain objective medical
evidence showing that Coleman's ability to perform the hearing
officer's self-described "basic mental demands" to perform
unskilled work, Adm. R. at 14, is at best questionable.  For
example, Dr. Russell's reporting of repeated instances of Coleman
arriving early for refills due to inattentiveness, id. at 624,
arriving late for appointments after forgetting they were
scheduled, id. at 211, or showing up unannounced after forgetting
the proper procedure, id. at 688, do not clearly show to a lay
person that Coleman has the capacity "to understand, carry out,
and remember simple instructions."  See id. at 14.  Furthermore,

23

Dr. Kovalcik's consultative examination report revealed that Coleman had some "mild weaknesses in the domain of mental control" and was only in the thirtieth percentile for general memory index.  Id. at 394.

Viewing the record as a whole, this Court holds that the record indicates more than mild psychological impairments imposing more than slight limitations on Coleman's ability to function.  Based on the foregoing – including Coleman's fluctuating mental state, changing prescriptions, and repeated instances of corroborated memory loss – it was improper for the hearing officer to interpret the bare medical record and determine Coleman's mental residual functional capacity.  See Rivera-Figueroa, 858 F.2d 48, 52 (1st Cir. 1988) ("Absent a residual functional capacity assessment from an examining psychiatrist, we do not think the [hearing officer] was equipped to conclude that the claimant's condition was so trivial as to impose no significant limitation on ability to work."); Roberts v. Barnhart, 67 F. App'x 621, 623 (1st Cir. 2003) (per curiam) (holding an expert mental RFC assessment was required, despite evidence that claimant's mental abilities were intact, due to evidence that claimant had difficulties with maintaining attendance, following through with a schedule, and leaving the house while depressed); Sanabria, 2008 WL 2704819, at *5 (holding

24

claimant's "symptoms were too complex and too prone to fluctuation to permit a common-sense lay assessment of her mental RFC"). Thus, the hearing officer's decision is not supported by substantial evidence readily verifiable on the record as it stands.

Because the interrelationship of Coleman's severe psychological and physical impairments may affect her RFC to perform her past work, or work in the greater national economy, this Court remands this case to the Commissioner for development of evidence of Coleman's mental and physical functional ability.

## III. CONCLUSION

The decision of the hearing officer is vacated and the case is remanded. Accordingly, for all the reasons stated above, this Court GRANTS Coleman's motion as to her request for remand, ECF No. 10 and DENIES the Commissioner's motion for an order affirming the decision of the hearing officer, ECF No. 12.


SO ORDERED.

/s/ William G. Young
_____
WILLIAM G. YOUNG
DISTRICT JUDGE